Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/06/2024 10:11 AM CST

**State of Nebraska, appellee, v.
Daniel W. Sindt, appellant.**

___ N.W.2d ___

Filed January 30, 2024.    No. A-23-373.

1. **Criminal Law: Convicted Sex Offender: Evidence.** A crime that is generally not a typical sex crime may still require registration under the Sex Offender Registration Act if the court finds that evidence of sexual penetration or sexual contact was present in the record.
2. **Convicted Sex Offender: Appeal and Error.** An appellate court will affirm a court's ruling that a defendant must register under the Sex Offender Registration Act if, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found with a firm conviction that the crime involved sexual contact.
3. **Evidence: Appeal and Error.** As with any sufficiency claim, regardless whether the evidence is direct, circumstantial, or a combination thereof, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

Appeal from the District Court for Buffalo County: Ryan C. Carson, Judge. Affirmed.

Sharon E. Joseph, Deputy Buffalo County Public Defender, for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

Bishop, Arterburn, and Welch, Judges.

Bishop, Judge.

## I. INTRODUCTION

Daniel W. Sindt pled no contest to third degree assault and second degree false imprisonment and was sentenced by the Buffalo County District Court to concurrent terms of 1 year in jail with credit for 71 days for time already served. The court also ordered Sindt to register under Nebraska's Sex Offender Registration Act (SORA). See Neb. Rev. Stat. § 29-4003 (Cum. Supp. 2022). Sindt appeals the portion of his sentence that ordered him to register under SORA, because he claims there was not sufficient evidence to prove sexual penetration or sexual contact. We affirm.

## II. BACKGROUND

On August 18, 2022, the State filed an information charging Sindt with one count of first degree sexual assault, a Class II felony, in violation of Neb. Rev. Stat. § 28-319 (Reissue 2016). The State alleged that on April 24, 2022, Sindt subjected P.M. to sexual penetration without her consent, or knew or should have known that she was mentally or physically incapable of resisting or appraising the nature of such conduct. Sindt pled not guilty.

Thereafter, Sindt and the State reached a plea agreement pursuant to which the State filed an amended information on February 10, 2023, charging Sindt with one count of third degree assault, a Class I misdemeanor, in violation of Neb. Rev. Stat. § 28-310 (Reissue 2016), and one count of second degree false imprisonment, a Class I misdemeanor, in violation of Neb. Rev. Stat. § 28-315 (Reissue 2016). P.M. was the named victim in both counts.

At a hearing that same day, February 10, 2023, Sindt, pursuant to the plea agreement, pled no contest to the charges in the amended information. His attorney specified that Sindt was entering "an Alford plea where he is entering his plea as a result of a plea bargain, which he feels that he is reducing his risk of going to trial, the benefit outweighs the risk

of trial." The parties stipulated to the affidavit in support of the arrest warrant being used as a factual basis. The affidavit stated in relevant part:

> That on April 24th, 2022[, P.M.] reported that she was too intoxicated to drive so she called a cab to take her home from [a bar] at approximately 01:00 a.m. on 4-24-2022. She was picked up by the owner of [a cab company, Sindt,] and he took her to his house. [P.M.] said she woke up today and had injuries to her inner thighs and her vagina was burning. [P.M.] believed she had been sexually assaulted.

> [A] witness, [name], will testify he is the bar tender for [the bar]. That he personally observed . . . Sindt come into the entry of the bar. That he knows . . . Sindt is the owner of [the cab company]. That his friend, [P.M.] got into a black SUV that had stickers designating the vehicle as [a cab].

> [A] witness, Nurse [name,] will testify she was called in by the Family Advocacy Network . . . to perform an examination on April 24th, 2022 at approximately 05:00 p.m. [The nurse] will further testify she performed a sexual assault examination of [P.M.], evidence was collected . . . , that she documented and photographed injuries observed on [P.M.'s] body. That [the nurse] documented abrasion and scratches on the right arm, lateral redness on the right torso, abrasions and bruising on the right inner thigh, and redness and a tear on the vulva/introitus. . . .

> . . . .

> [A] witness, [name,] will testify that he is an employee of [a gas station]. He will testify that on April 24th 2022 at approximately 04:00 a.m., [h]e unlocked the front door to open the store. That . . . approximately 10 minutes later a female entered the store and her eyes were glassy and she was speaking "jibberish" and incoherent. [The witness] will further testify the female had no shoes on

and her phone was dead. [The witness] will testify that a fellow employee gave the female a ride home.

[A] witness, [name,] will testify she is a manager of [the gas station]. That she provided this affiant with surveillance video of events that occurred at that location on April 24th, 2022 between 04:00 and 04:20 a.m.

. . . This affiant will testify after viewing the video that the female observed on the . . . video . . . is confirmed to be [P.M.] This affiant will testify from personal knowledge and prior law enforcement contacts that . . . Sindt [has] gray hair slicked back . . . .

[A] witness, Technical Services Officer [name,] will testify that he processed clothing that was submitted into evidence by [another officer]. [The technical services officer] will further testify that he located a blood area on the inside of [P.M.'s] jeans that tested positive for human blood with presumptive testing. That he located small gold to reddish hairs on the victim's clothing that was consistent with animal hair fibers. That he located longer gray hair on [P.M.'s] clothing that is consistent with human hair fibers.

. . . .

. . . That [P.M.] will testify that on April 24th, 2022, she was wearing her black and white Vans brand shoes, blue jeans, black T-shirt over a black tank top, white bra, and . . . underpants . . . . That when she went into [the gas station] she did not have any shoes on and later in the day she was also missing her underpants.

. . . This affiant will testify that on April 29th, 2022 at approximately 09:50 a.m., Investigators served a search warrant at . . . the residence of . . . Sindt. That a pair of black and white Vans shoes were located in the garage. That . . . Sindt pointed out that he had located the shoes inside his residence and moved them to the garage. That . . . Sindt admitted to this affiant that he is the owner of [the cab company] and he drove his black

. . . SUV cab to [the bar] on April 24th, 2022 at approximately 01:10 a.m., and he and the bar tender helped [P.M.] into [his vehicle]. . . . Sindt admitted that he transported [P.M.] to his house and that she was holding his dachshund puppy inside his residence.

The district court found there was an adequate factual basis for the counts charged in the amended information. However, before the court accepted Sindt's plea, it advised Sindt that "because of some of the allegations contained in the arrest affidavit . . . there is a possibility that I might need to require that you register under [SORA]," and if that happened, the registration period would be 15 years. The court asked Sindt if he still wished to move forward with his plea. Sindt replied in the affirmative. The court accepted Sindt's no contest plea to the charges in the amended information and a "conviction [was] entered". The case was set for sentencing.

At the sentencing hearing on April 21, 2023, the district court stated it had reviewed the presentence report, including various attachments, and the statements of Sindt and P.M. After hearing arguments, the court sentenced Sindt to concurrent terms of 1 year in jail for the third degree assault and second degree false imprisonment, with credit for 71 days for time already served.

[1] The district court then conducted an expansive sentencing hearing to address the issue of registration under SORA. A crime that is generally not a typical sex crime, such as third degree assault or false imprisonment, may still require registration under SORA if the court finds that "evidence of sexual penetration or sexual contact . . . was present in the record, which shall include consideration of the factual basis for a plea-based conviction and information contained in the presentence report." § 29-4003(1)(b)(i)(B). See, also, *State v. Norman*, 282 Neb. 990, 1009, 808 N.W.2d 48, 64 (2012) (*Norman I*) ("because a liberty interest is at stake, a meaningful hearing requires consideration of evidence at the hearing as well as the factual basis and the presentence report";

since registration decision is not punitive, fact necessitating registration can be decided by court as opposed to jury).

Sindt's counsel offered a report from the Nebraska State Patrol Crime Laboratory into evidence as exhibit 1, and the exhibit was received without objection. The report contained DNA test results. P.M.'s external genital swabs contained male DNA, but Sindt was excluded as a contributor to the DNA; another named male (P.M.'s now ex-boyfriend) could be included as a contributor to that DNA. P.M.'s vaginal swabs were negative for the presence of male DNA; her cervical swabs were positive for the presence of male DNA, but processing of the DNA sample was stopped due to the insufficient quantity of male DNA detected; and her anal/rectal swabs were inconclusive due to the insufficient amount of male DNA detected.

Sindt's counsel argued that although exhibit 1 showed that male DNA was present, it belonged to someone else, not Sindt. Counsel stated, "I do not doubt that [P.M.] was assaulted, but all along, I believe that [Sindt] has asserted that it was not him, and . . . I believe that . . . Exhibit 1 actually supports his position that there was no sexual penetration by my client, but it was a different actor."

The State argued that just because there was an absence of DNA from Sindt, "that's not evidence that there wasn't sexual penetration," because "there can be sexual penetration with a condom" and "[t]here can be sexual penetration without actual physical evidence of DNA." The State argued that there was evidence of injuries and there was evidence of opportunity. The State believed there was an adequate factual basis for the district court to require Sindt to register under SORA.

The district court stated:

In looking at the record here, the only people that know what happened that night [are Sindt] and [P.M.] And what we do have is the circumstantial evidence surrounding those circumstances, and they are troubling . . . .

It does appear, looking at the police reports, that [P.M.] discovered that she was missing her underwear after her encounter with you, even though she doesn't recall what happened that particular night. She was experiencing pain, following that encounter. An examination conducted afterwards . . . did show evidence consistent with, it appears to be, penetration. Again, she doesn't recall.

It appears she was inebriated. There is plenty of evidence to show that you were with her. . . . I think your explanation is that you were giving her a ride, she couldn't recall where she lived, and so you needed to go to your house and let your dog out. So I certainly considered that too.

The court stated there was evidence present in the record of sexual penetration or sexual contact. However, the court was "struggling a little bit . . . with Exhibit No. 1." The court said:

Exhibit No. 1 does indicate that there was an insufficient quantity of male DNA detected in the swabs and other samples that were taken, but I don't know if that alleviates the fact that in the factual basis there is evidence of sexual penetration or sexual contact present in the record.

The court then found that the State satisfied the requirements under § 29-4003 and required Sindt to register under SORA. It entered a written order requiring the same.

Sindt appeals.

### III. ASSIGNMENTS OF ERROR

Sindt assigns that the district court erred by (1) finding that the State had met its burden to prove by clear and convincing evidence that his conviction involved sexual penetration of or sexual contact with P.M., (2) basing its findings on the factual basis and not considering exhibit 1 sufficiently, and (3) imposing a sentence that was excessive, to the extent that it required him to register as a sex offender.

## IV. STANDARD OF REVIEW

[2,3] An appellate court will affirm a court's ruling that a defendant must register under SORA if, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found with a firm conviction that the crime involved sexual contact. See *State v. Norman*, 285 Neb. 72, 824 N.W.2d 739 (2013) (*Norman II*). As with any sufficiency claim, regardless whether the evidence is direct, circumstantial, or a combination thereof, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *Id.*

## V. ANALYSIS

Sindt claims that the district court erred by imposing a sentence that was excessive, to the extent that it required him to register as a sex offender, because there was not sufficient evidence to show that his conviction involved sexual penetration of or sexual contact with P.M. Sindt argues that the court based its findings on the factual basis and did not consider exhibit 1 sufficiently.

As stated previously, a crime that is generally not a typical sex crime, such as third degree assault or false imprisonment, may still require registration under SORA if the court finds that "evidence of sexual penetration or sexual contact . . . was present in the record, which shall include consideration of the factual basis for a plea-based conviction and information contained in the presentence report." § 29-4003(1)(b)(i)(B). The Nebraska Supreme Court has construed § 29-4003(1)(b)(i)(B) to meet constitutional due process requirements as follows:

> When considering requiring a defendant convicted of an offense not sexual in nature to register under SORA . . . , the court must give the defendant notice that such order is being considered and that a hearing will be held to determine whether the fact required under § 29-4003(1)(b)(i)(B) exists. The State must establish

the fact of sexual penetration or sexual contact by clear and convincing evidence. The defendant may present evidence at the hearing to dispute evidence regarding sexual penetration or sexual contact. After considering the evidence in the record, including the factual basis for a plea, the presentence report, and evidence adduced at the hearing, the court must make a finding, based on clear and convincing evidence, whether the defendant committed an act of sexual penetration or sexual contact related to the incident that gave rise to the defendant's conviction. If the court so finds, then it must order that the defendant is subject to SORA.

*Norman I*, 282 Neb. at 1011, 808 N.W.2d at 64-65.

After *Norman I, supra*, was remanded for consideration of whether to require SORA registration under the requirements set forth above, the district court again ordered SORA registration and the defendant appealed in *Norman II, supra*. The Nebraska Supreme Court then determined, as a matter of first impression, the standard of review for reviewing a district court's finding of sexual contact in a SORA registration hearing. It held that factual findings under SORA are reviewed under a "sufficiency-of-the-evidence type of standard of review." *Norman II*, 285 Neb. at 76, 824 N.W.2d at 742.

There is no dispute in the record that around 1 a.m. on April 24, 2022, Sindt, the owner of a cab company, picked P.M. up from a bar because she was too intoxicated to drive home. Sindt does not dispute that he ended up taking P.M. to his home, that she was there for some period of time, and then she left.

### 1. Evidence From Record

#### (a) Factual Basis and DNA Report

We have previously set out the factual basis for the plea and the DNA report received as evidence at the SORA hearing.

### (b) Police Reports

According to police reports contained in the presentence report, on April 24, 2022, at approximately 3:28 p.m., P.M. went to "the Law Enforcement Center to make a report about something that had occurred to her last night." The reporting officer stated that he "could still smell the odor of alcohol coming off her person while in the lobby." P.M. reported that she had been drinking at a bar and decided to take a cab home. She remembered that just prior to getting into a cab, she told "some guy that was hitting on her all night that he could not go home with her." P.M. thought she ended up at the home of the man who owned the cab company and "recalled sitting on his kitchen floor and petting a puppy that he had." She also recalled having a "cordial conversation" with the man but was not sure what they talked about. "The next thing she remembers is being at [a gas station] without her shoes." The officer's report stated, "She said that he dumped her there, but I thought she also told me that she did not know how she made it there." P.M. remembered talking to an employee at the gas station and then getting a ride home. "Upon waking up today, she said that she did not have her shoes and that she was also missing her underwear." "She also said that her phone was stuck in a start up loop[.]" "She then said that she was not sure exactly what she was reporting and seemed visibly upset." The officer then asked her "some blunt questions." P.M. said she was sexually active and knew what it felt like after having sex. When the officer asked if she felt that way that day, P.M. "said that she did have 'burning' down there, referring to her vaginal area." When the officer asked P.M. if she wanted to report that she was possibly raped, she said, "[Y]es." P.M. described the shoes (black and white Vans) and underwear that she had been wearing.

The police report states that P.M. was examined by a nurse at approximately 5 p.m. on April 24, 2022. The nurse prepared a report that listed the following observation of injuries on P.M.'s body: "abrasion and scratches on the right arm, lateral

redness on the right torso, abrasions and bruising on the right inner thigh, and redness and a tear on the vulva/introitus."

According to the police reports, at approximately 8:48 a.m. on April 25, 2022, P.M. was interviewed by a forensic interviewer. P.M. stated that she had been drinking most of the day. She called a cab for a ride home from the bar. She stated that she had been flirting with a named man at the bar and told him that she was going home and he was not going with her. P.M. remembered getting picked up at the bar by "Dan," the owner of the cab company, around 1 a.m. She remembered sitting on the floor at Dan's house in the kitchen and petting his puppy. P.M. "said things are a bit foggy because she did not know why she was at Dan's house." She said her phone was not working, so she was not able to call anyone. She "had a pack of cigarettes that were smashed all over inside her purse, her Nebraska ID was in a side pocket of her wallet and she always keeps it in the front, so she felt someone had gone through her purse." P.M. was not sure how she ended up at the gas station parking lot but went inside with no shoes, and she was taken home by one of the employees. After she got home, P.M. "put her dogs out and went to bed." She woke up around 10:30 a.m. and realized she had scratches and bruises on her body and her vagina was burning. She also realized she was missing her underwear. She "remembered she had vomit in her hair."

According to police reports, the location data from P.M.'s cell phone placed her at the bar until "0140 hours" and at Sindt's residence from "0152 hours" until approximately "0400 hours." Video from the store was obtained on April 25, 2022. It showed P.M. entering the store at approximately 4:05 a.m. with no shoes and leaving with a female employee at approximately 4:19 a.m.

A search warrant was subsequently executed at Sindt's residence on April 29, 2022. An officer talked to Sindt and advised him that they were investigating a sexual assault and

he was a suspect. Sindt stated that a friend of his had called to tell him a girl was "setting him up for a sexual assault."

According to the police report, Sindt admitted that P.M. was in his house for approximately an hour. He also admitted that P.M.'s shoes and sweatshirt were in his house and that he originally threw her sweatshirt in the trash because it had vomit on it, but he then took the sweatshirt back out of the trash and put it and her shoes on a shelf in the garage; the items were seized. Sindt said he had picked P.M. up from the bar shortly after 1 a.m., and P.M. was telling him how to get to her house, but she could not remember her address. Sindt asked why she did not check her license, but she said she had a Colorado driver's license so her local address was not on it. Sindt had to go to the bathroom, but a nearby gas station was closed, so he could not use the bathroom there. Sindt said he and P.M. were talking about dogs and "'hitting it off,'" so he told her about his puppy at home and that he needed to go home "to let the puppy out and he could use the bathroom then." Sindt drove to his home and "[P.M.] thought it was funny to try to blow alcohol into his alcohol ignition interlock device." When he got home, he made sure P.M. got out of his cab because he had money in the cab and "did not want her to blow into his interlock." Sindt had P.M. sit in a chair in his garage, and he opened the door to go inside his residence to use the bathroom. His puppy came into the garage, so he let P.M. hold it while he used the bathroom. As he was exiting the bathroom, P.M. was coming inside his residence holding the puppy. At one point, P.M. took her shoes off when she was sitting on a chair in his living room. Sindt went "out front to smoke," and P.M. came outside with him and vomited on her sweatshirt, so she took it off but had a shirt on under it. Sindt told her she could use the bathroom downstairs to clean up, and as she was going downstairs, she fell down the last few stairs "on her butt." When P.M. came out of the bathroom, he told her that he could get her another cab to take her home or that he could do so, but she "just mumbled." Sindt denied having sex with

P.M., stating that "he is not into vomiting people." Sindt said when P.M. fell down the stairs, she got vomit on the stairs and he had to clean it up.

During the execution of the search warrant at Sindt's residence, bedding from a basement bedroom was seized; suspected bloodspots were located on pillows, as well as a blanket and a comforter. (We note that there is nothing in the record to confirm that the spots were blood, and if they were blood, then whose blood it was.)

### (c) P.M.'s Victim Impact Statement

In her victim impact statement, P.M. stated, "I am assuming that because I had consumed too much alcohol, I am not able to remember most of the time that I was in [Sindt's] home or what happened there." P.M. remembered sitting at Sindt's house playing with his puppy and that Sindt spoke to her. But she said, "I have never been able to recall the details of the conversation or what happened just before or after that point." P.M. stated:

> At four in the morning, two and a half hours after being picked up by the cab, and just twenty minutes after . . . Sindt said I left his residence, I somehow became completely aware of myself. I was then standing in [the] gas station, just a block from . . . Sindt's house. I look down at my phone and it is no longer functional as it says it is doing a reset. I am confused as to why I am there and what is going on with my phone. I walk up to the cash register and speak to a gentleman and tell him that I need to find a ride home and my phone is not working. That gentleman spoke to his female coworker, and they agree that she could give me a ride to my house. The woman followed my directions, and we made it directly to my home. No wrong turns, no guessing where I was talking about, no confusion whatsoever. A direct route to my home. A place I had already been living at for a year and a half. I unlocked the door, entered my home, took my dogs to the bathroom, and proceeded to go to bed.

When I awoke that morning, I knew something was terribly wrong. My body was sore and achy. My thighs hurt and my private area burned. I sat up to look and see what was causing this and I found the bruises and scratches to the inside of my thighs. My phone was not allowing me to access it due to being reset, and I had a terrible gut feeling about what had happened. I checked my clothes that I had worn the night before for any evidence of being damaged and there was nothing. No holes, rips, tears, or even scuffs. I then realized that my underwear and my shoes were missing as well. The items in my wallet were disheveled. My ID was in a completely different compartment, and all the cash that I had in my wallet was missing.

Panic was setting in. I knew what had happened to me without having memory of it. For the next three hours or so I paced the house and tried to piece things together. I finally reached out to a number I found online just to speak to someone. I think deep down I knew I needed to call and report it . . . .

#### (d) Sindt's Statement

During his presentence investigation interview, Sindt said that he picked P.M. up from the bar shortly after 1 a.m. and that she was "'extremely intoxicated'" at the time. When he asked her where she needed to go, she told him "'I don't know.'" P.M. told him she would just show him because she did not have the physical address. Sindt followed her directions, but she was slurring her words and nodding off. While Sindt kept driving, P.M. kept telling him that she could not remember her address but felt they were getting close. After "continuously driving to multiple streets and running out of potential homes he started feeling irritated" and asked to see P.M.'s driver's license, but she told him it was a Colorado license. At one point, P.M. started "hiccupping and spitting up," so Sindt pulled over and opened the door; P.M. then

vomited. He again asked her if there was somewhere he could take her because he needed to clean the cab for his morning "pick up[s]." P.M. was not able to provide an address or location. Sindt told her he was going to his residence/office to clean up the cab and figure out where she lived.

After he pulled into his driveway, he asked P.M. to sit in the garage/office area and told her to think about an address or someone she could call. Sindt went inside to get cleaning supplies and to let his puppy out; when P.M. saw the puppy, she started playing with it. Sindt got on his dispatch radio and told other cabdrivers "he needed someone to come pick [P.M.] up as he was cleaning his vehicle." He went inside to get P.M. water, and she followed him in and fell. She then sat in his recliner and took off her shoes. Sindt continued to ask her to find an address or someone she could contact, but P.M. said her phone was rebooting.

Sindt received word from another cabdriver, who said he was "20 to 30 minutes out" before he could get to Sindt's residence to pick up P.M. Sindt went outside to smoke. P.M. came outside and began stumbling. She then vomited, and he led her downstairs to the basement bathroom to get herself cleaned up; while doing so, she slipped and fell, "hitting every step." In the bathroom, P.M. was "fully clothed," but she had taken off her sweatshirt that was covered in vomit. Sindt started cleaning the stairs and carpet. Sindt then helped P.M. back upstairs so she could wait for the other cab. He returned downstairs to clean the basement bathroom. When he went back upstairs, P.M. was gone. Sindt got on the dispatch radio and asked if the other cabdriver had picked up P.M., but he learned P.M. had not been picked up by another cabdriver. Sindt estimated it was approximately 3:30 a.m. when P.M. left. He put P.M.'s sweatshirt and shoes outside, locked the doors, and went to bed because he had to wake up at 5 a.m. to provide cab rides.

Other than the DNA report offered at the SORA registration evidentiary hearing, Sindt offered no additional evidence.

## 2. SUFFICIENT EVIDENCE OF SEXUAL
### PENETRATION OR CONTACT?

The district court "struggle[ed] a little bit" with exhibit 1, the DNA report, but ultimately found that there was evidence present in the record of sexual penetration or sexual contact. Accordingly, the court then found that the State satisfied the requirements under § 29-4003 and required Sindt to register under SORA.

Sindt, however, argues, "When taken as a whole the State failed to prove by clear and convincing evidence that [he] subjected P.M. to sexual penetration or sexual contact." Brief for appellant at 11. Sindt argues that P.M. only believed she had been sexually assaulted that night, but that her "few memories of that night do not contradict Sindt's statements and do not indicate any sexual contact with Sindt." *Id.* at 13. "[T]here is nothing in the record to show that law enforcement was able to find any evidence that Sindt was the individual who subjected P.M. to sexual contact or penetration," *id.* at 14, and that another man was determined to be the contributor to the male DNA from P.M.'s external genital swabs.

The State, on the other hand, argues that the district court's finding was "backed by circumstantial evidence." Brief for appellee at 8. According to the State, the "[c]ircumstantial evidence in the record showed that Sindt had sexual contact with P.M." *Id*. Sindt picked her up in his cab and took her to his home, and she was there for 2½ hours. She remembered little about what happened at Sindt's home, but later got a ride home from a gas station employee. She woke up with burning around her genitalia, as well as bruising and scratches on the inside of her thighs. The State notes that although P.M.'s underwear was not recovered, other pieces of her clothing were found at Sindt's home. And a medical examination concluded that P.M. suffered redness and a tear on her vulva. The State contends that "[t]he only opportunity for P.M. to have received her injuries was during her time at Sindt's home." *Id.* at 9. The State notes that P.M. reported

no injuries or attack during the time that she was drinking at
the bar, when she was at the gas station, or during her ride
home from the gas station. "The only period during which
she experienced a substantial loss of memory during which
the assault could have occurred was during her time at Sindt's
home," and "the only opportunity for her underwear to have
gone missing was at Sindt's home, where other pieces of her
clothing were found." *Id.* at 9. The State also points out that
the factual basis for the charges to which Sindt pled no con-
test stated that P.M. believed that Sindt had sexually assaulted
her. Thus, "Sindt admitted to P.M.'s allegation that Sindt had
sexually assaulted her." *Id.* Finally, the State argues that just
because P.M.'s ex-boyfriend's DNA was found on her does
not mean that Sindt could not have also had sexual contact
with P.M. And "other male DNA was collected from the rape
kit, which may have been Sindt's had the samples been suf-
ficient to analyze." *Id.* at 10.

In his reply brief, Sindt points out "erroneous assertions"
made by the State: that (1) because P.M.'s underwear was
never recovered, Sindt must have removed it because P.M.'s
"jacket and shoes" were at his home; (2) the only opportunity
for P.M. to have received her injuries was during her time at
Sindt's home; and (3) because he entered an "Alford plea," he
admitted to sexually assaulting P.M. Reply brief for appellant
at 7. Sindt argues that the only clothing shown to have been
removed at his residence were P.M.'s shoes when she went
inside his home and later her jacket (previously described
as a sweatshirt), after she vomited on it. "The fact that those
outerwear items were left at [his home] do[es] not logically
lead to the conclusion that P.M.'s underwear must have been
removed at the same time . . . . In fact, P.M. did not discover
her underwear missing or any injuries until late the next
morning." *Id.* at 8. Sindt further argues that "P.M. appeared to
have only very small snippets of memory until at least 10:30
a.m." and that "[t]hus, the State's argument that the only
opportunity for P.M. to have received her injuries was during

the two hours she was at Sindt's residence is significantly flawed." *Id*. at 8, 9. Finally, Sindt argues that "[a]n *Alford* plea is made when the defendant specifically denies the truth of the allegation but believes that the risk of trial outweighs the benefit of the plea offer." *Id.* at 9. Sindt contends that the only evidence of sexual contact or penetration with regard to P.M. is found in exhibit 1, the DNA laboratory reports wherein Sindt was specifically excluded as a contributor, and that contrary to the State's reading of the exhibit, there was no evidence of a second male contributor to the DNA.

Viewing the evidence in the light most favorable to the State, as we must, a rational trier of fact could have found with a firm conviction that Sindt's crime(s) involved sexual penetration or sexual contact, and we therefore affirm the district court's ruling that Sindt must register under SORA. See *Norman II, supra*. P.M. was at Sindt's home for at least 2 hours, and although she does not recall much of her time there, when she awoke in the morning, she had injuries indicating she had been subjected to sexual penetration or sexual contact. Although DNA reports excluded Sindt as the contributor to the DNA from P.M.'s external genital swabs, that does not mean he did not subject her to sexual penetration or sexual contact. Based on all the circumstantial evidence presented, the district court found that the State satisfied the requirements under § 29-4003. And an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. See *Norman II, supra*.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's decision to require Sindt to register under SORA.

Affirmed.